UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ X

INVESTMENT TECHNOLOGY GROUP,
INC., ITG INC., ITG SOLUTIONS
NETWORK, INC., AND THE
MACGREGOR GROUP, INC.,

             **Plaintiffs/Counterclaim-**
**Defendants,**

    - against -

LIQUIDNET HOLDINGS, INC.,

             **Defendant/Counterclaim-**
**Plaintiff.**

------------------------------------------------------ X

LIQUIDNET HOLDINGS, INC.,

             **Plaintiff/Counterclaim-**
**Defendant,**

    - against -

PULSE TRADING, INC.,

             **Defendant/Counterclaim-**
**Plaintiff.**

------------------------------------------------------ X

**OPINION & ORDER**

**07 Civ. 510 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/21/10

**07 Civ. 6886 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.**

I.    **INTRODUCTION**

       This opinion resolves four motions for summary judgment involving

claim one of a method patent[1] owned by Liquidnet Holdings, Inc. ("Liquidnet").
In brief, Liquidnet has alleged that certain electronic methods for integrating buy-side firms' order management systems with electronic securities marketplaces, developed and marketed by Investment Technology Group ("ITG")[2] and Pulse Trading, Inc. ("Pulse"), literally infringe claim one of Patent '834, and that ITG willfully infringed the Patent.  ITG and Pulse allege that Patent '834 is invalid, unenforceable, and not infringed by ITG's and Pulse's products.

On January 19, 2010, following a Markman hearing, I issued an opinion adopting certain constructions of claim one.[3]  ITG and Liquidnet, and Pulse and Liquidnet, now cross-move for summary judgment on literal infringement; ITG moves for summary judgment on Liquidnet's willful infringement claim; and Liquidnet moves for partial summary judgment on ITG's inequitable conduct claim (part of its claim that Patent '834 is unenforceable).

For the following reasons, I grant ITG's and Pulse's motions for

---

[1]     11/14/06 U.S. Patent 7,136,834 ("Patent '834"), Ex. 1 to Affidavit of Jenny Workman, counsel to ITG.

[2]     "ITG" refers collectively to Investment Technology Group, Inc., ITG Inc., ITG Solutions Network, Inc., and The MacGregor Group, Inc.

[3]     *See Investment Tech. Group, Inc. v. Liquidnet Holdings, Inc.*, Nos. 07 Civ. 510, 07 Civ. 6886, 2010 WL 199912 (S.D.N.Y. Jan. 19 2010) ("*Claim Construction*").  This decision assumes familiarity with my construction of claim one, as well as the law applicable to claim construction, as stated in that opinion.

-2-

summary judgment of no literal infringement and deny Liquidnet's motions on that claim. I also grant ITG's motion for summary judgment on Liquidnet's willful infringement claim and deny Liquidnet's motion for partial summary judgment on ITG's inequitable conduct claim.

## II.    BACKGROUND[4]

On November 14, 2006, the Patent and Trademark Office ("PTO") issued Patent '834 – entitled "Electronic Securities Marketplace Having Integration with Order Management Systems" – to Liquidnet.[5] In basic terms, the patented invention allows institutional investment management firms to connect with an electronic marketplace and trade securities (or other financial instruments) with one another.[6]

### A.    Claim One of Patent '834

Claim one of the Patent – the only claim at issue in this case – describes a method for integrating an order management system ("OMS") with an

---

[4]    For ease of understanding, I outline the factual background and applicable law relevant to each of the three claims on which summary judgment in this case is sought – literal infringement, willful infringement, and inequitable conduct – in the separate sections of this opinion in which I discuss each set of briefs relating to those claims.

[5]    Patent '834.

[6]    I incorporate here by reference my discussion of "The Invention," as stated in *Claim Construction*, 2010 WL 199912, at *1.

electronic marketplace ("ETM") for the purpose of sending non-binding indications to that marketplace:

1. A computer-implemented method for generating non-binding indications for at least one security comprising:

i) *accessing, by at least one computer, all records of open orders* from a database of an order management system wherein the order management database is associated with a trading firm and wherein the order management system is coupled to at least one workstation utilized by the trading firm wherein the order management system database comprises at least the following fields.
(a) security name, symbol or identifier,
(b) transaction type,
(c) total order size,
(d) quantity of the security placed elsewhere, and
(e) quantity of the security executed;

ii) *generating, by at least one computer, all non-binding indications* from the accessed records of orders that are *suitable for transmission* to at least one *electronic marketplace*, each *non-binding indication* comprising security name, symbol or identifier, the transaction type, and an available quantity, such available quantity being determined by the accessed records;

iii) *sending* the suitable *non-binding indications* to the at least [*sic*] one *electronic marketplace*.

iv) *periodically determining* if at least one accessed record of order of the order management system database has changed, then *subsequently generating*, for the changed record of order, at least one updated *non-binding indication*; and

v) if updated, *subsequently sending* the updated *non-binding*

*indication* to the at least [*sic*] one *electronic marketplace.*[7]

## B.   Claim Construction

In an Opinion and Order dated January 19, 2010, I construed the

disputed terms (italicized above) as follows:

> "Accessing" means "gaining entry to."
> "All" means "each and every."
> "Open orders" means "instructions to buy or sell a quantity of a security not yet placed elsewhere (*i.e.*, where the total order size exceeds the quantity, if any, committed to another broker or other execution venue)."
> "Generating" means "producing non-binding indications in a format understood by the electronic marketplace."
> "Non-binding indications" means "non-binding purchase or sale offers that allow traders to enter into negotiation to trade securities, which cannot be executed without a further, affirmative action by a trader."
> "Suitable for transmission" means "appropriate for transmission."
> "Electronic marketplace" means "an electronic destination that (1) receives and processes non-binding indications, (2) allows for the matching of non-binding indications with their contra interests and for the negotiation and execution of trades, and (3) has the capacity to record trades if and when they are executed."
> "Sending" means "transmitting."
> "Periodically determining" means "determining from time to time."
> "Subsequently generating" means "subsequently producing."
> "Subsequently sending" means "subsequently transmitting."[8]

---

[7]      Patent '834 col.12 l.50-col.13 l.15 (emphasis added to terms disputed during Claim Construction).

[8]      *Claim Construction*, 2010 WL 199912, at *13-14.

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[9]  "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law.'"[10]  "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[11]

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[12]  However, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim."[13]

---

[9]   Fed. R. Civ. P. 56(c).

[10]   *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[11]   *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008).

[12]   *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

[13]   *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

## IV.   DISCUSSION

### A.   ITG and Pulse Are Entitled to Summary Judgment of Non-Infringement

ITG and Liquidnet, and Pulse and Liquidnet, now cross-move for summary judgment of literal infringement. ITG and Pulse argue they are entitled to summary judgment of no literal infringement, while Liquidnet argues that ITG and Pulse literally infringe Patent '834 as a matter of law. Upon a finding that either ITG or Pulse fails to perform even one of the claim's five steps, it is entitled to summary judgment.

ITG's and Pulse's primary arguments for non-infringement are as follows: (1) ITG and Pulse do not perform step (i) because they do not "access" "all" records of open orders from a database of an OMS; (2) ITG and Pulse do not perform step (ii) because they do not generate "non-binding indications"; (3) ITG does not perform step (iii) because it does not send "non-binding indications" to an "electronic marketplace"; and (4) ITG and Pulse do not enable traders to enter into negotiations to trade securities (relevant to steps (ii)-(v) in light of my construction of "non-binding indications" and "electronic marketplace"). I agree with ITG and Pulse that, with the exception of one integration employed by ITG ("MacGregor XIP integrations"), ITG and Pulse do not "access" "all" records of open orders from databases of OMSs. I also agree with ITG that, because its accused products

-7-

do not constitute an "electronic marketplace" as this Court has construed that term, it cannot perform steps (iii) and (v) of claim one, which require "sending" "non-binding indications" to at least one "electronic marketplace." Accordingly, I deny Liquidnet's motions for summary judgment of literal infringement and grant summary judgment to both ITG and Pulse with respect to literal infringement. I need not (and do not) address ITG's and Pulse's other arguments for non-infringement.

### 1.   Facts Relating to Literal Infringement Claim

The accused products in this case – ITG's "Channel" and "POSIT Alert" and Pulse's "BlockCross" – are used by hedge funds and asset management firms to facilitate the electronic execution of U.S. equity (stock) trades.[14] These firms, which include mutual fund managers, pension funds, and private equity funds, are often referred to as "buy-side firms."[15]

Portfolio managers at buy-side firms direct the investment of the firms' funds; they decide which securities will comprise the "portfolio" of assets in which

---

[14]   *See* ITG's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("ITG 56.1") ¶¶ 1-2; Liquidnet's Statement of Undisputed Facts Pursuant to Local Rule 56.1 in Support of Motion for Partial Summary Judgment Against Pulse ("Liquidnet v. Pulse 56.1") ¶ 3; Pulse's Memorandum of Law in Support of Motion for Summary Judgment ("Pulse Mem.") at 2.

[15]   ITG 56.1 ¶ 1.

their funds are invested.[16]  These investments can span U.S. and foreign stocks,

bonds, options, futures, currencies, and derivatives.[17]

When a portfolio manager decides to purchase or sell a particular

security, she enters that instruction, or "order," into an OMS.[18]  OMSs are software-

based systems used by buy-side firms to manage their investment strategies.[19]  All

records of orders for an entire firm are maintained in the firm's central "OMS

database."[20]

Buy-side firms also employ traders who manage, or "work," the actual

buying and selling of assets for the firm – as opposed to deciding *which* assets to

buy and sell (the portfolio managers' job).[21]  Traders are given permission to call up

(or see) only certain orders in a firm's portfolio.[22]  They view those orders on their

trader desktop computers, or "workstations," using OMS graphical user interfaces

---

[16]     *See id.* ¶¶ 13-14.

[17]     *See id.* ¶ 13.

[18]     *See id.* ¶ 14.

[19]     *See id.* ¶ 12.

[20]     *Id.* ¶ 15.  For example, according to Patent '834's specification, "each OMS database holds data representative of open, contemplated, or completed orders to buy and/or sell securities . . . ."  Col.5 ll.42-44.

[21]     ITG 56.1 ¶ 16.

[22]     *See id.* ¶ 17.

("GUIs").[23]  The GUIs include electronic "blotters" that display certain information from the records in the OMS database that the trader is responsible for working.[24]

Traditionally, buy-side traders traded securities by picking up the phone and calling sell-side brokers to fill orders.[25]  Since the mid-1990s, however, traders have been able to place orders electronically directly from their OMS blotters, or from other electronic trading platforms, such as execution management systems (EMSs).[26]  Using an OMS or EMS, a trader can electronically place, change, cancel, and update his orders, and receive execution information electronically, without using the phone.[27]

---

[23]     *Id.* ¶ 18.

[24]     *See id.* ¶ 19.  Traders call this GUI the "blotter" because traders once managed the same order information by hand on paper "blotters." *See id.* ¶ 20.  A trader blotter typically displays, for each order: (1) an identification of the asset to be bought or sold; (2) the total number of shares to buy or sell (*i.e.*, the total order size); (3) details regarding shares the trader already bought or sold (*i.e.*, executed or completed orders); (4) details regarding any "firm" buy/sell orders that the trader already placed, but that have not been executed (*i.e.*, "firm orders" or "placed orders"); and (5) the number of shares the trader has not yet placed anywhere ("unplaced" or "open" orders). *Id.* ¶ 22.  "Firm" orders are orders that, once submitted to an electronic marketplace, are "binding" on traders; in other words, once they are "matched" with a "contra-indication," they are automatically executed, with no further, affirmative action required by the trader. *See id.* ¶¶ 65, 69-70, 74-75.

[25]     *See id.* ¶ 24.

[26]     *See id.* ¶ 25.

[27]     *See id.* ¶ 27.

### a. ITG's Accused Products: Channel and POSIT Alert

Liquidnet accuses two ITG products, "ITG Channel"[28] ("Channel") and "POSIT Alert," of infringing the Patent. Channel is an EMS and "desktop trading tool" that ITG developed to help buy-side traders electronically route (or channel) firm orders "strictly to ITG trading destinations."[29] Through some integration with buy-side firms' OMS databases,[30] Channel obtains only those records of open orders for U.S. equities.[31] Channel then displays the unplaced share data for which a particular trader is responsible for "working" on that trader's Channel "blotter," a GUI located on her workstation.[32]

From her Channel blotter, a trader has two, non-mutually exclusive options. *First*, the trader can convert the unplaced share data into a "firm order" by sending it directly to one of ITG's trading destinations for execution.[33] *Second* – or

---

[28]     The MacGregor XIP, an order management system manufactured by The MacGregor Group, Inc. (owned by ITG), integrates with Channel. *See id.* ¶ 1.

[29]     *Id.* ¶¶ 32-33.

[30]     A more detailed description of the manner in which the accused products integrate with client-side OMS databases is included in Section IV.A.1.c below.

[31]     *See* ITG 56.1 ¶¶ 42, 45.

[32]     *See id.* ¶¶ 33-34, 36, 38, 58.

[33]     *See id.* ¶ 67. ITG's "trading destinations" include (1) "POSIT," (2) ITG's suite of trading algorithms ("ITG Algorithms"), and (3) the ITG trading desk. *Id.* ¶¶ 65-76. POSIT is an electronic "crossing" system that matches firm

in addition[34] – she can expose the unplaced share data in POSIT Alert.[35]

POSIT Alert is not a trading destination, but rather an alerting mechanism – it "alerts" traders when it finds matching (1) *binding* indications in POSIT and other ITG trading destinations or (2) *non-binding* indications in POSIT Alert.[36] When POSIT Alert finds a potential match, it notifies all the traders having relevant exposed unplaced shares in POSIT Alert that a potential match exists.[37] Upon such notification, each trader has a limited number of seconds to decide whether she wishes to act on that alert by sending a firm order to POSIT – *i.e.*, converting the non-binding indication into a binding indication for potential execution in POSIT.[38] POSIT Alert does not identify the number of traders matched, the identity of those traders, the quantity of securities on either side of the

---

orders received from traders across ITG's entire client base and executes them at the midpoint of the National Best Bid and Offer (NBBO) price. *Id.* ¶¶ 65, 68.

[34]    *See id.* ¶¶ 78, 82-83.

[35]    *See id.* ¶ 78.

[36]    *Id.* ¶ 79. *Accord* Liquidnet's Statement of Undisputed Facts Pursuant to Local Rule 56.1 in Support of Motion for Partial Summary Judgment Against ITG ("Liquidnet v. ITG 56.1") ¶¶ 58-59.

[37]    *See* ITG 56.1 ¶ 84; Liquidnet v. ITG 56.1 ¶ 63.  The parties refer to the binding or non-binding indication with which the trader's exposed unplaced share information is matched as a "contra-indication."

[38]    *See* ITG 56.1 ¶ 88; Liquidnet v. ITG 56.1 ¶¶ 64-65.

trade, or the price at which any trader may wish to execute a trade.[39]  The trader only knows that (1) there are one or more traders on the opposite side of the desired trade (2) with unknown quantities of shares available, (3) with whom she might match in POSIT (4) if both sides send firm orders to POSIT and those firm orders have compatible terms.[40]

### b.   Pulse's Accused Product: BlockCross

Like Channel, BlockCross receives only U.S. equity order information from buy-side firms' datacenters by integrating in some way with those firms' OMS databases[41] and displaying only those orders for which individual traders are responsible on those traders' BlockCross "blotters."[42]  As with Channel, a trader using BlockCross can designate a trade in one of two modes – "Confirm" mode or "Auto-Ex" mode – or both.[43]  For trades designated for Confirm mode, BlockCross (like POSIT Alert) alerts traders of crossing opportunities.[44]  Like POSIT,

---

[39]     *See* ITG 56.1 ¶¶ 86-87.  All a trader knows with respect to the other side's quantity in POSIT Alert is that it is more than the minimum order size set for the system. *See id.* ¶ 87.

[40]     *See id.* ¶ 87.

[41]     *See* Pulse's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pulse 56.1") ¶¶ 15-16.

[42]     *See id.* ¶¶ 28-29.

[43]     Liquidnet v. Pulse 56.1 ¶ 55.

[44]     *See id.* ¶ 57.

BlockCross automatically executes "Auto-Ex" trades at the NBBO price upon finding a matching contra-Auto-Ex indication.[45]  All BlockCross trades execute at the NBBO or "mid-point" price.[46]

### c.   Obtaining Order Information Located in OMS Databases

As noted above, Channel and BlockCross obtain information about open orders for U.S. equities from their clients' OMS databases by "interfacing" or setting up "integrations" with OMS vendors – integrations that vary depending on the vendor.[47]

Pulse has integrations set up with ten different OMS vendors.[48]  Of the ten, eight involve "stored procedure" integrations and two involve "web service" integrations.[49]  In the stored procedure integrations, BlockCross issues a "call" to

---

[45]     See Pulse 56.1 ¶ 31.  When designating an order for Auto-Ex mode, a trader may also select a "Follow-on" option that enables her to complete additional trading (after her initial order has been executed in BlockCross), but only if the contra-trader with whom her initial order was executed *also* pre-set her order to "Follow-on."  *See id.* ¶¶ 37-38.  If both parties have pre-set their orders to Follow-on, and an AutoEx trade is executed, the parties will have an opportunity to do another trade in Confirm mode.  *See id.* ¶ 39.

[46]     Liquidnet v. Pulse 56.1 ¶ 56.

[47]     *See* Pulse 56.1 ¶¶ 7, 9; ITG 56.1 ¶¶ 40, 48-49; Liquidnet v. ITG 56.1 ¶¶ 40-41.

[48]     *See* Pulse 56.1 ¶ 7.

[49]     *Id.*

-14-

the OMS through an application programming interface ("API") written by the

OMS vendor or its client.[50]  The call requests information about U.S. equity orders

from the OMS by asking the API to execute a "stored procedure" in the OMS

database.[51]  After issuing the call to the API, BlockCross has no further involvement

with the OMS database until the API returns the U.S. equity order information to

BlockCross.[52]  In the web server integrations, BlockCross retrieves U.S. equity

order information from a web server, which is separate from the OMS.[53]

Unlike Pulse, ITG owns an OMS – the MacGregor XIP – that

integrates with Channel.[54]  For ITG clients who use Channel with the MacGregor

XIP, Channel prompts or "calls" a specific stored procedure in MacGregor XIP,[55] as

in the Pulse "stored procedure" implementations described above.  This stored

---

[50]     *Id.* ¶ 14.

[51]     *See id.* ¶¶ 15-16.

[52]     *See id.* ¶ 18.

[53]     *See id.* ¶ 10.  Pulse asserts that in web services integrations,
BlockCross software ("BCX") communicates with a web services server and does
not integrate with an OMS.  *See* Pulse's Response to Liquidnet's Statement of
Undisputed Facts Pursuant to Local Rule 56.1 ("Pulse Response to Liquidnet
56.1") ¶ 35.

[54]     *See* ITG 56.1 ¶¶ 1, 41-42.

[55]     *Id.* ¶ 41.

procedure, written by MacGregor,[56] locates U.S. equity orders in the database, "reads in memory only those records, retrieves the read data, and sends it to Channel."[57]

For non-MacGregor OMS clients, the technology used by Channel to obtain unplaced share information varies depending on the client and the OMS it uses.[58] Like BlockCross, Channel utilizes both stored procedure and non-stored procedure implementations.[59] Channel's stored procedure implementations work similarly to its MacGregor XIP implementations: a "call" prompts a customer-provided program that is either written by the OMS vendor or buy-side firm to send order information to Channel.[60] Channel then stores the unplaced share data in a Channel database.[61] Channel's non-stored procedure interfaces include "socket connections, web services, COM API's and flat files (i.e., 'file drops')."[62] As with

---

[56]     *See id.* ¶ 42.

[57]     *Id.* ¶ 45.

[58]     *See id.* ¶ 48.

[59]     *See* Liquidnet v. ITG 56.1 ¶¶ 40-41.

[60]     *See* ITG's Response to Liquidnet's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("ITG Response to Liquidnet 56.1") ¶¶ 41, 43 (disputed by ITG only to the extent the "call" is not a communication with the database, but rather "some sort of prompt to that program to send information").

[61]     *See* ITG 56.1 ¶ 45.

[62]     Liquidnet 56.1 ¶ 40.

the stored procedure integrations, in all of these non-stored procedure integrations, the buy-side firm "decides what orders it wants to be able to trade at ITG through Channel and it works directly with its OMS vendor to gather the pertinent information. Some form of vendor-written computer program obtains order data by methods known only to the vendor-author, and provides the data to Channel, either by transmitting the order data to Channel or by storing the order data in an agreed upon network location, such as in a flat file or a port."[63] The OMS vendors maintain, create, and own the software code that they write and do not give ITG access to it.[64]

### 2. Applicable Law

Patent infringement refers to "the unauthorized making, using, selling, offering to sell, or importing into the United States of any patented invention during the term of the patent."[65] Determination of infringement involves two steps: (1) a construction of the terms of the asserted claims ("Claim Construction") and (2) a determination of whether the accused method infringes the claims as construed.[66]

---

[63]   ITG 56.1 ¶ 49. *Accord* ITG Response to Liquidnet 56.1 ¶ 40.

[64]   *See* ITG 56.1 ¶ 54.

[65]   35 U.S.C. § 271(a).

[66]   *See Metabolite Labs., Inc. v. Laboratory Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004).

Claim construction is a question of law, the purpose of which is to determine what is covered by the claims of a patent.[67]  In cases where "the parties do not dispute any relevant facts regarding the accused product but disagree over [claim interpretation], the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment."[68]

A plaintiff may establish infringement either by proving literal infringement or by using the doctrine of equivalents.[69]  To prove literal infringement, the patentee must show by a preponderance of the evidence that the

---

[67]  *See, e.g., Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1376 (Fed. Cir. 2005) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc)).  As a general principle, Federal Circuit precedent governs issues of patent law, while the law of the regional circuit applies to nonpatent issues.  *See, e.g., Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1323 (Fed. Cir. 2003).

[68]  *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996).  *Accord Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999) ("Because the relevant aspects of the accused device's structure and operation are undisputed in this case, the question of whether Zebco's AutoGuide product infringes the claims of Johnson's '835 patent turns on the interpretation of those claims.").

[69]  *See Windbrella Products v. Taylor Made Golf Co.*, 414 F. Supp. 2d 305, 311 (S.D.N.Y. 2006).  The parties' motions, and this opinion, address only whether ITG's and Pulse's accused products literally infringe claim one of Patent '834.  *See* ITG 56.1 ¶ 11.  Moreover, Liquidnet has repeatedly stated that it is not relying on the doctrine of equivalents.  *See* Transcript of Oral Argument on ITG's, Pulse's, and Liquidnet's Motions for Summary Judgment on November 22, 2010 at 6-7.

device accused of infringement contains every limitation in the asserted claims.[70] "For process patent or method patent claims, infringement occurs when a party performs all of the steps of the process."[71] "An infringement issue is properly decided upon summary judgment when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device."[72]

       "[W]here the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, *i.e.*, the 'mastermind.' At the other end of this multi-party spectrum, mere 'arms-length cooperation' will not give rise to direct infringement by any party."[73] "[T]he control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for

---

[70]    *See, e.g., PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995) ("To establish literal infringement, every limitation set forth in a claim must be found in an accused product, *exactly*.") (emphasis added).

[71]    *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379 (Fed. Cir. 2007).

[72]    *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001).

[73]    *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008), *cert. denied*, 129 S.Ct. 1585 (2009).

the acts committed by another party that are required to complete performance of a claimed method."[74]   Although

> the standard requiring control or direction for a finding of joint infringement may in some circumstances allow parties to enter into arms-length agreements to avoid infringement . . . [t]he concerns over a party avoiding infringement by arms-length cooperation can usually be offset by proper claim drafting.  A patentee can usually structure a claim to capture infringement by a single party. . . . [A] court will not unilaterally restructure the claim or the standards for joint infringement to remedy [] ill-conceived claims.[75]

### 3.   Neither Pulse nor ITG (Other than MacGregor XIP Implementations) Literally Infringes Step (i) of Claim One of the '834 Patent

Pulse and ITG argue that their products do not, as a matter of law, "access[] . . . all records of open orders from a database of an order management system,"[76] as required by step (i) of claim one.  With the exception of Channel's MacGregor XIP integrations, I agree.  As I explain below, the parties do not dispute any relevant facts regarding the accused methods, but instead disagree over the

---

[74]   *Id.* at 1330 (alleged infringer that merely "controls access to its system and instructs bidders on its use is not sufficient to incur liability for direct infringement"). *Id.* at 1331.

[75]   *BMC Res.*, 498 F.3d at 1381. *Accord Sage Prods. Inc. v. Devon Indus. Inc.*, 126 F.3d 1420, 1425 (Fed. Cir. 1997) ("[A]s between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection for this foreseeable alteration of its claimed structure.").

[76]   Patent '834 col.12 ll.52-54.

meaning of the word "accessing" in step (i). Thus "the question of literal infringement collapses to one of claim construction and is . . . amenable to summary judgment."[77] The relevant, undisputed facts make clear that the only orders Pulse and ITG (in non-MacGregor OMS integrations) could possibly "access" – if they access any orders at all – are U.S. equity orders. However, because ITG controls or directs the stored procedures responsible for locating U.S. equity orders in MacGregor XIP databases, I cannot find as a matter of law that ITG does not perform step (i) for those implementations.

### a.   Claim Construction

Step (i) of claim one requires "accessing, by at least one computer, all records of open orders from a database of an order management system . . . ."[78] During Claim Construction, I defined "accessing" to mean "gaining entry to" and "all" to mean "each and every."[79] Thus, to infringe claim one, Pulse's and ITG's products must (1) gain access to (2) each and every record of open orders from a database of an OMS.

In defining "accessing" as "gaining entry to," I explained that "when the patent applicants used the term 'accessing,' they contemplated a process in

---

[77]   *Athletic Alternatives*, 73 F.3d at 1578.

[78]   Patent '834 col.12 ll.52-54.

[79]   *Claim Construction*, 2010 WL 199912, at *13-14.

which [an OMS interfacing module ("OIM")][80] would be able to *gain entry to* the records and read them while they remained within the database."[81]  I pointed to language in the specification describing a process by which an "OMS database integration module [ODIM] in the OIM reads data records stored in the OMS database"[82] to support my conclusion that "accessing" refers to "a mode of 'communication' between the OIM and the OMS database *wherein the OIM reads and monitors records within the OMS database*."[83]  I found this definition supported by extrinsic evidence – a computer dictionary published by Microsoft in 2002 that defines "access" as "[t]o gain entry to memory in order to read or write data."[84]  Thus, records of open orders located in an OMS database are "accessed" when an OIM gains access to those records by reading them in OMS databases' memory.  And, according to the plain language of step (i), *all* records of open orders must be accessed in order for claim one to be infringed.  In other words,

---

[80]     Under the terms of the specification, a "module" is "machine-executable code and/or data, but may also include associated circuitry, such as processing circuitry, as well as data storage areas, and/or other software or hardware." Patent '834 col.5 ll.42-46.

[81]     *Claim Construction*, 2010 WL 199912, at *7.

[82]     Patent '834 col.3 ll.44-46.

[83]     *Claim Construction*, 2010 WL 199912, at *8 (emphasis added).

[84]     *Id.*

Liquidnet must show that Pulse and ITG utilize OIMs that read data about – or gain entry to – "each and every" record of open orders contained within the OMS databases with which they are integrated.

As I explained in *Claim Construction*, the process of gaining entry to each and every record of open orders in the OMS database is different from the process of "retrieving" some or all of those records – a step that occurs *after* a trader logs on to the OMS and *after* the records have been accessed, or read in memory, and determined to be "suitable for transmission"[85]:

> Once a determination is made that a trader has logged on to the OMS the OIM retrieves data records about orders suitable for transmission to the ETM from the OMS database. In one embodiment of the present invention, all open orders are suitable for transmission to the ETM. In other embodiments of the present invention, the OIM, through the filtering module, makes the determination of suitable orders based on other criteria, such as the security type (e.g., stock or bond), security name (e.g., IBM or T), order type (e.g., market or limit order), order quantity, and/or price.[86]

In other words, after an OIM reads in the OMS database's memory data about *each and every* record of open orders in the OMS database, it determines which of the "accessed records" are suitable for transmission to the ETM. If only some records are suitable for transmission to the ETM, an OIM will filter the accessed records

---

[85]    *Id.* at *7.

[86]    Patent '834 col.11 ll.17-27.

and then retrieve only those suitable for transmission to the ETM.[87]  As I made clear

in *Claim Construction*, these retrieving and filtering steps are not part of the

"accessing" that takes place in step (i); they are unclaimed steps that take place

before an OIM "generat[es] . . . *from*" the "accessed records" "non-binding

indications" in step (ii).[88]  But the disclosure of these "filtering," "retrieving," and

"generating" steps – claimed or unclaimed – only reinforces that the patented

method requires *all* records of open orders to be read from the OMS database's

memory.[89]

          Notwithstanding my claim construction, Liquidnet argues that "the act

of 'accessing' is the act of communicating with an OMS database that contains all

records of open orders . . . ."[90]  But the syntax of step (i) makes clear that it is the

_____

[87]     The fact that only some orders are suitable for transmission in some
embodiments of Patent '834 does not change the fact that a necessary step of the
patented method is accessing each and every one of those records.

[88]     Patent '834 col.12 l.65-col.13 l.1.

[89]     Pulse argues that "this is not a trivial distinction.  As explained by
Liquidnet's founder and inventor of the '834 patent, the order information on an
OMS database '. . . is the most sensitive information on Wall Street.'  For
Liquidnet, convincing their customers to allow this 'blotter sweeping' was '[t]he
biggest obstacle that [Liquidnet] had to overcome.'  And it has had real-life impact;
Liquidnet averages nearly four times more shares executed on a daily basis than
Pulse."  Pulse Mem. at 4.

[90]     Liquidnet's Memorandum in Opposition to Pulse's Motion for
Summary Judgment ("Liquidnet Opp. Mem. to Pulse Mem.") at 5.

"records of open orders" that the patented method must access, not the database.

Liquidnet's proposed construction of step (i) essentially reads out of the claim the

words "all records of open orders from." That the records – rather than the database

– are the object of the verb "accessing" is only confirmed by the language of steps

(ii) and (iv), which require the performance of additional steps on the "accessed

records of orders" – such as "generating . . . non-binding indications from"[91] them

and "determining if at least one" of them "has changed."[92]

      However, it is true that the database itself must be accessed in order for

the records *within* that database to be accessed. So if step (i) merely required

accessing a database of an OMS, then Liquidnet would only need to show that ITG

and Pulse communicate with OMS databases. After all, the specification discloses

---

[91]    Patent '834 col.12 ll.65-66.

[92]    *Id.* col.13 ll.7-9. I also note that, if Liquidnet's construction of step (i) were correct, much of claim one, and the vast majority of the patent's specification, would be superfluous. In other words, if merely communicating with the database and receiving some order information were sufficient to constitute "accessing" all records of open orders, the specification would not need to disclose any "reading," "filtering," or "retrieving" steps. But the method of *integration* with OMS databases that Patent '834 discloses is one of its crucial components: Its title is "Electronic Securities Marketplace *Having Integration with* Order Management Systems," and the first line of its Abstract discloses "interfacing modules *interfacing directly with order management systems* (OMS's) at trading institutions." Patent '834 Abstract. Under Liquidnet's theory, all Liquidnet must show to win a motion for summary judgment is that accused infringers periodically *receive some* records of open orders from OMS databases. Given the plain language of claim one, the specification, and the prosecution history, Liquidnet's construction is simply not reasonable.

that "[t]he OIM is in communication with the OMS database and the ETM. . . ."[93]
But this language in the *specification* – upon which Liquidnet bases its entire
argument – does not describe step (i) of the *claim*, which requires "accessing . . . *all
records of open orders from* a database of an order management system."[94]  Rather,
it describes the ancillary step of accessing the database itself – a step that is
necessary but not sufficient to prove literal infringement of step (i).

### b.    ITG and Pulse Do Not "Access[] . . . All Records of Open Orders From" Databases of Non-MacGregor OMSs

Liquidnet has adduced no evidence – and does not argue – that ITG
and Pulse employ OMS integration modules that read in memory *all* records of
open orders from the OMS databases with which they interface.  Rather, it argues
that mere "communicat[ion] with an OMS database that *contains* all records of open
orders" suffices to constitute infringement of step (i).[95]  But the undisputed facts
make clear that in all "stored procedure" integrations, *the OMSs* with which Pulse
and ITG integrate filter the records of open orders for U.S. equity orders *before* they
are obtained – let alone "read in memory" or accessed – by any sort of OIM.  Thus,
only records of open *U.S. equity* orders – a subset of "all" records of open orders --

---

[93]    Patent '834 col.3 ll.43-44.

[94]    *Id.* col.12 ll.52-54.

[95]    Liquidnet Opp. Mem. to Pulse Mem. at 5 (emphasis added).

could possibly be accessed by Pulse and ITG in non-MacGregor XIP[96] stored procedure integrations.  For non-stored procedure integrations, Liquidnet has not even adduced evidence sufficient to support *its* argument that ITG and Pulse "communicate with" OMS databases, let alone access all records of open orders within those databases.  Therefore, ITG and Pulse are entitled to summary judgment of non-infringement for all non-MacGregor OMS integrations.

      *First*, Liquidnet does not even articulate a theory of infringement for ITG's and Pulse's non-stored procedure integrations.  In addition to stored procedures, Channel utilizes "socket connections, web services, COM API's and flat files (i.e., 'file drops');"[97] two of BlockCross's ten integration types involve "web server" implementations.[98]  But Liquidnet fails to explain in any of its submissions or arguments what any of these things is, let alone how they involve accessing *all* records of open orders in an OMS database.[99]  Instead, Liquidnet

---

[96]    I address MacGregor XIP integrations at the end of this discussion.

[97]    Liquidnet 56.1 ¶ 40.

[98]    Pulse 56.1 ¶ 9.

[99]    Nor does Liquidnet explain how these integrations involve "communication with" an OMS database – despite the fact that its entire argument is based on the theory that "the act of 'accessing' is the act of communicating with the OMS database."  Liquidnet's Memorandum in Opposition to ITG's Motion for Summary Judgment ("Liquidnet Opp. Mem. to ITG Mem.") at 12.  What is more, evidence presented by ITG suggests that "for some interfaces, such as a file drop, no call is required," ITG Response to Liquidnet 56.1 ¶ 41, and that the "technology

waffles between (1) failing to incorporate the non-stored procedure integration methods in its analysis[100] and (2) conclusorily asserting that Channel and BlockCross make "queries" to OMS databases via "various communications protocols" into which it lumps all non-stored procedure implementations.[101]  It

---

used to copy unplaced share information to Channel" can involve "storing the order data in an agreed upon network location, such as in a flat file or a port," ITG 56.1 ¶¶ 48-49 – an integration method that would not appear to involve any communication *with the OMS database.  See also* ITG Response to Liquidnet 56.1¶ 41 (disputing that "[w]ith each Channel interface, a customer-provided program . . . provides order information in response to a 'call' sent by Channel"); *id.* ¶ 50 ("Channel does not always 'request' [information from the OMS]; in some workflows, the information is just sent to the client.").

[100]     *See* Liquidnet's Memorandum of Law in Support of Motion for Partial Summary Judgment Against Pulse ("Liquidnet v. Pulse Mem.") at 8 ("In a '*typical deployment* . . . BCX . . . uses [Open Data Base Connectivity] to connect to the database and to call the stored procedures . . .'") (emphasis added); Liquidnet's Response to ITG's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Liquidnet Response to ITG 56.1") ¶ 50 ("Channel, ITG-developed software, gains entry to all of the orders in the OMS database through its 'prompts' or 'calls' to the stored procedure"); Liquidnet Opp. Mem. to ITG Mem. at 15 ("without those calls, no order information can be swept into Channel"); *id.* at 14 ("Channel ITG's 'call' to the OMS database, is the equivalent of the visitor either physically entering the library or the user accessing the database search functionality of the library's website.").

[101]     Liquidnet Opp. Mem. to ITG Mem. at 12.  *See, e.g., id.* (asserting that Channel makes "'queries' to the [OMS databases] via various communications protocols (*e.g.*, stored procedures, API, webservice, and sockets), and a 'TIM' interface running on at least one Channel ITG server"); Liquidnet Opp. Mem. to Pulse Mem. at 5 (asserting that "BlockCross gains entry to the OMS databases . . . by making 'queries' to the database via a communications protocol and a 'BCX' interface running on at least one BlockCross server computer.").

makes no attempt to explain how "open[ing] up a socket"[102] or how integrations

involving "web services," "web servers," "COM API's," or "flat files (i.e., 'file

drops')" allow ITG or Pulse to gain entry to all records of open orders in the OMS

database's memory.

   *Second*, it is undisputed that in stored procedure integrations, Channel

and BlockCross issue "calls" to OMS databases, or to APIs *in* the OMS databases –

written by OMS vendors or their respective clients – instructing the OMS databases

to execute stored procedures.[103] The order information requested by Channel and

---

   [102] Liquidnet Opp. Mem. to ITG Mem. at 12 ("Channel performs the 'accessing' step by 'open[ing] up a socket' to receive information from the OMS database.").

   [103] *See* Pulse 56.1 ¶¶ 14-15 ("In the stored procedure integrations, BlockCross issues a call to the OMS through an application program interface ('API')" that "requests order information from the OMS by asking the API to execute a stored procedure in the OMS database."); ITG 56.1¶ 41 ("For ITG clients who want to use Channel with the MacGregor XIP OMS, Channel prompts or 'calls' a specific stored procedure – a piece of software code – in MacGregor XIP."); ITG Response to Liquidnet 56.1 ¶ 43 ("ITG admits that '[i]n the case of a stored procedure, Channel will call a vendor written procedure . . . .'"); *id.* ¶ 44 ("with respect to stored procedure type OMS interfaces, Channel 'calls' a specific stored procedure in the MacGregor XIP or another OMS database . . .").
   Throughout its briefs, Liquidnet describes "Channel" and "BlockCross" both as the destinations for retrieved order data *and* as the entities responsible for "accessing" the OMS databases and the records of open orders therein. Conveniently, this glosses over Patent '834's clear portrayal of (1) an OIM that accesses all records of open orders, which are then transmitted (2) to an ETM. When Liquidnet employs such language, it essentially reads out of the claim the necessary step wherein all records of open orders are read in OMS databases' memories – the essential first step of claim one.

BlockCross via these calls is never more than information about U.S. equity orders,[104] which are a subset of the records of open orders on an OMS database.[105] For example – *as Liquidnet explains in its brief* – "BlockCross "mak[es] 'calls' to stored procedures in the OMS database, which in turn use [an] Index as a roadmap

---

[104]   *See* Pulse 56.1 ¶ 16.

[105]   *See id.* ¶ 26; ITG 56.1 ¶¶ 41-43, 45.  Liquidnet disputes that U.S. equity orders are merely a subset of open orders located in OMS databases, asserting that "[t]here is no way for . . . anyone . . . to know whether or not an OMS database at a buy-side institution exists whose records comprise only U.S. equity orders."  Liquidnet's Response to Pulse's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Liquidnet Response to Pulse 56.1") ¶ 6.  However, it is Liquidnet's burden to prove infringement by clear and convincing evidence.  And the Patent *specification* discloses that the "securities" that "[e]ach OMS database holds data representative of" can include stocks, bonds, "or any other financial instrument, contract, or transaction, such as a forward, futures, option, put, call, collar, swap, or currency contract."  Patent '834 col. 5 ll.21-45.  It also discloses that the patented method "makes the determination of suitable orders based on other criteria . . . *such as the security type (e.g., stock or bond)*."  *Id.* col.11 ll.26-27 (emphasis added).  Moreover, it is undisputed that buy-side firms' investment funds "contain a variety of U.S. and foreign stocks, bonds, options, futures, currency, derivatives, etc."  ITG 56.1 ¶ 13.  Therefore, in light of the undisputed evidence that ITG and Pulse only obtain information about U.S. equity orders, Liquidnet's response amounts to an admission that its evidence is insufficient as a matter of law.  *See also* ITG 56.1 ¶ 55 (citing the deposition of Liquidnet's infringement expert, Joshua Galper, who testified that, during the two-and-a-half to three years that he has been working on this case, he has never communicated with any OMS vendor or underlying customer to ascertain whether they, in fact, give Channel access to all records of open orders and that he was merely speculating when he testified that he thought ITG might be getting all orders) (disputed by Liquidnet only as an "incomplete" characterization of the testimony).  Liquidnet Response to ITG 56.1 ¶ 55.

to look for the requested U.S. equity orders."[106]   After issuing the call, Pulse and

ITG have no further involvement with the OMS database until order information

"suitable for transmission" to BlockCross and Channel is returned by a stored

procedure in the OMS database.[107]   That information never consists of more than

open U.S. equity orders.[108]   Therefore, in stored procedure implementations, Pulse

(BlockCross) and ITG (Channel) do not access *all* records of open orders in OMS

databases.  The undisputed evidence proves that the only open order information to

which they could possibly "gain entry" in these implementations is the U.S. equity

order data returned by OMS databases to Channel and BlockCross.

      This description is the *only undisputed evidence* that Channel and

BlockCross perform any sort of OIM-like functionality.  This is because, despite the

fact that "ITG [for example] produced to Liquidnet over 86,000 pages of

documents, as well as the actual software code for Channel, and despite the fact that

Liquidnet deposed ten fact witnesses of Channel, Liquidnet does not rely on any of

---

[106]      Liquidnet Opp. Mem. to Pulse Mem. at 8-9.

[107]      *See* ITG 56.1¶ 49 ("in every case, the client decides what orders it
wants to be able to trade at ITG through Channel and it works directly with its
OMS vendor to gather the pertinent information.  Some form of vendor-written
computer program obtains order data by methods known only to the vendor-author,
and provides the data to Channel . . . by transmitting the order data to Channel
. . . ."); *id.* ¶ 54; Pulse 56.1 ¶ 18.

[108]      *See* Pulse 56.1 ¶ 26; ITG 56.1 ¶¶ 41-43.

this testimony, or on the functional specification documents for Channel, or on the software code"[109] to make its argument.  Instead, Liquidnet's briefing consists almost entirely of statements from Pulse and ITG documents describing Pulse integration software ("BCX") and "BCGetOrders" stored procedures and an ITG interfacing module ("TIM"),[110] the accuracy and implementation of which ITG and Pulse dispute.[111]

However, even if these documents fully, accurately, and undisputedly described Pulse's and ITG's OIM functionality, they would *support* the undisputed fact that any records of open orders accessed by Pulse and ITG – or read in the OMS databases' memory – have already been filtered to exclude non-U.S. equity orders.  For example, the "TIM" document explains that "the OMS Vendor will

---

[109]   ITG's Reply to Liquidnet's Memorandum in Opposition to ITG's Motion for Summary Judgment ("ITG Reply Mem.") at 1-2.

[110]   *See, e.g.*, Liquidnet v. Pulse Mem. at 2-5, 8, 9, 14, 15; Liquidnet's Memorandum of Law in Support of Motion for Partial Summary Judgment Against ITG ("Liquidnet v. ITG Mem.") at 5-8, 15, 22, 23.

[111]   For example, ITG disputes that the TIM was ever built or implemented, describing the ITG document on which Liquidnet relies as "conceptual."  ITG's Memorandum in Opposition to Liquidnet's Motion for Summary Judgment ("ITG Opp. Mem.") at 2.  *Accord* ITG Response to Liquidnet 56.1 ¶ 35 ("TIM was never deployed and plays no role in the Channel interface. TIM was merely a concept that was never built.").  Similarly, Pulse asserts that "there is no evidence that any OMS vendor or BlockCross customer has a 'BCGetOrders' stored procedure. . . .  Stored procedures on an OMS database are written, maintained and owned by the OMS vendor and BlockCross customer." Pulse Response to Liquidnet 56.1 ¶ 45.

need to supply the following interface: stored procedure to access open orders from the OMS database."[112]  And the BCX document explains that the software will periodically query the OMS database to execute a stored procedure, which will request the OMS database to "return all active US equity orders whose available quantity meets a specified minimum number of shares."[113]

Liquidnet admits that it is the stored procedures – located in the OMS database and written by OMS vendors (*not* ITG or Pulse)[114] – that "look for the requested U.S. equity orders" and return only those orders to BlockCross or Channel.[115]  Therefore, only U.S. equity orders could possibly be accessed by any Pulse or ITG interfacing module.[116]  Nowhere does Liquidnet confront the most

---

[112]     ITG Reply Mem. at 2 n.1 (quotation marks omitted).

[113]     Liquidnet v. Pulse 56.1 ¶ 45 (quotation marks omitted).

[114]     Liquidnet Opp. Mem. to ITG Mem. at 8 ("OMS vendors obviously own the right and title to the source code for the OMS software product that they market.").

[115]     Liquidnet Opp. Mem. to Pulse Mem. at 8-9.

[116]     Liquidnet's legal theory for step (i) also has implications for step (iv), which requires "periodically determining if at least one accessed record of order of the [OMS] database has changed. . . ." Patent '834 col.13 ll.7-9. "To prove infringement, Liquidnet must present evidence, for each OMS interface, that the OMS interface determines – checks to see – if the accessed records in the database have changed." ITG Opp. Mem. at 23.  But to the extent Liquidnet argues that Channel and BlockCross merely *communicate* with OMS databases – databases whose stored procedures determine whether any accessed records have changed – it concedes that ITG and Pulse do not perform the "determining" step.  Indeed,

obvious implication of these undisputed facts – that it is these stored procedures, which are not part of ITG's alleged "TIM" interfacing module or BlockCross's BCX software, that access all records of open orders in OMS databases.

Perhaps this is because Patent '834 simply does not encompass integrations with OMSs in which stored procedures filter out non-suitable orders *before* the records are obtained (*or* accessed) by an OIM. The claim's "accessing" step is necessary because *all records of open orders in the OMS databases memory must be read* in order for the OIM to perform the remaining functions outlined in the specification – including filtering the data to determine which orders are suitable for transmission to the ETM. But Liquidnet has adduced no evidence that an ITG or Pulse OIM "reads in memory" *any* records of open orders located in any non-MacGregor OMS database as required by Patent '834.

In its reply briefs, Liquidnet makes (for the first time) a conclusory "in the alternative" argument for joint infringement, asserting that "[e]ven if Claim [one] were somehow construed to require the actions of an entity other than ITG,

---

when explaining how ITG performs step (i), Liquidnet asserts that "each time Channel queries the OMS database for order information about a security, Channel will receive . . . the most updated order data, i.e., taking into account trade executions or other changes." Liquidnet v. ITG Mem. at 22. But "receiving" updated order data hardly constitutes "determining" whether that order data has changed – just as "communicating with" the OMS database hardly constitutes "gaining entry to" each and every record of open orders *in* that database.

there is still direct infringement, because [ITG and Pulse] control[] the actions of

the OMS database in performing the [Channel and BlockCross] method[s]."[117]

According to Liquidnet, this control derives from (1) Channel's and BlockCross's

"calls" to the stored procedures[118] and (2) the fact that ITG and Pulse provide OMS

vendors with "functional specifications" describing how to interface with Channel

and BlockCross.[119] *First*, even if ITG and Pulse did "control" the actions of the

OMS vendors, Liquidnet has adduced no evidence of how individual OMS vendors'

stored procedures work – *i.e.*, how they might, in the alternative, constitute

---

[117]    Liquidnet's Reply to ITG's Memorandum in Opposition to
Liquidnet's Motion for Summary ("Liquidnet Reply Mem. to ITG Opp. Mem.") at
8; Liquidnet's Reply to Pulse's Memorandum in Opposition to Liquidnet's Motion
for Summary Judgment ("Liquidnet Reply Mem. to Pulse Opp. Mem.") at 8.

[118]    *See* Liquidnet Reply Mem. to Pulse Opp. Mem. at 8 ("Pulse's
BlockCross system dictates the performance of each of the claimed steps, not the
OMS vendor."); Liquidnet Reply Mem. to ITG Opp. Mem. at 8 (asserting the same
for Channel); Liquidnet Response to ITG 56.1 ¶ 55 (asserting – in response to
ITG's statement that it "does not direct or control the accessing and retrieving
steps" – that "[a]bsent the call to the stored procedure or other means of
integration, no information would be returned to ITG. Channel's TIM interface is
used to make those calls.").

[119]    *See, e.g.*, Liquidnet Reply Mem. to Pulse Opp. Mem. at 8 ("Pulse's
own functional specifications provide that the BlockCross system 'periodically
queries the OMS database to determine orders and quantities avilable on a trader's
blotter' . . . . Any intermediate . . . steps that may be performed by an OMS vendor
and/or the OMS database itself are irrelevant to the infringement analysis . . . .").

"accessing."[120]  *Second*, even if Liquidnet had argued and proven that the stored

procedures unequivocally "gain entry" to all records of open orders, and even if

OMS vendors undisputedly wrote stored procedures pursuant to instructional guides

provided by ITG and Pulse,[121] Liquidnet could not prevail on a joint infringement

theory because the issuance of calls to OMS databases and the provision of

instructions to an arms length business partner do not constitute "'control or

direction' over the entire process such that every step is attributable to" ITG or

Pulse.[122]  In other words, Liquidnet misconstrues "the control or direction standard,"

---

[120]    The only evidence in this case of how relational databases and stored
procedures work (in general) is from Pulse's expert, Jim Knocke.  *See* Liquidnet
Response to Pulse 56.1 ¶ 8.  But Liquidnet does not even use *this* evidence to make
an "in the alternative" argument that stored procedures "gain entry to" all records
of open orders in OMS databases, instead asserting that it "is of no moment" that
"the stored procedures actually initiate the retrieval of the requested data records,
and may be 'written' and 'owned' by the OMS vendors . . . ."  Liquidnet Opp.
Mem. to Pulse Mem. at 8 (citations omitted).

[121]    Liquidnet has adduced no evidence that any of the OMS vendors
actually follow the "functional specifications" described in Pulse's "Stored
Procedure Guide" (for integration with BlockCross) or in ITG's "Channel
Functional Specifications" – a document which, according to ITG, "does not
contain the functional specifications for Channel."  ITG Reply Mem. at 2.  *Accord*
Pulse Response to Liquidnet 56.1 ¶¶ 44-47.

[122]    *Muniauction*, 532 F.3d at 1329.  *See, e.g., id.* at 1331 (alleged
infringer that merely "controls access to its system and instructs bidders on its use
is not sufficient to incur liability for direct infringement"); *Akamai Techs., Inc. v.
Limelight Networks, Inc.*, 614 F. Supp. 2d 90, 121 (D. Mass. 2009) ("*Muniauction*
establishes that direction or control requires something more than merely a
contractual agreement to pay for a defendant's services and instructions or
directions on how to utilize those services."); *Emtel, Inc. v. Lipidlabs, Inc.*, 583 F.

which inquires whether "the law would traditionally hold the accused direct
infringer vicariously liable for the acts committed by another party."[123]  But
Liquidnet does not dispute (and has put forth no evidence refuting) ITG's and
Pulse's showing that their relationships with OMS vendors amount to no more than
"mere 'arms-length cooperation'" that "will not give rise to direct infringement by
any party."[124]

      Although Liquidnet makes no legal distinction between the MacGregor
XIP and other OMS databases, I cannot ignore the undisputed fact that ITG owns
the MacGregor Group, which manufactures the MacGregor XIP – an OMS with
which ITG integrates by calling stored procedures written *by* the MacGregor Group.
Therefore, a court "would traditionally hold [ITG] vicariously liable for the acts

---

Supp. 2d 811, 831 (S.D. Tex. 2008) ("*BMC Resources* and *Muniauction* teach that
. . . . [p]roviding data to another party, as in *BMC Resources*, does not support an
inference of adequate 'direction or control.'  Controlling access to a system and
providing instructions on using that system – 'teaching, instructing or facilitating
of the other party's participation' in the patented system – as in *Muniauction*, does
not show adequate 'direction or control.'") (citations omitted); *Global Patent
Holdings, LLC v. Panthers BRHC LLC*, 586 F. Supp. 2d 1331, 1335 (S.D. Fla.
2008) ("[I]t appears that the level of 'direction or control' the Federal Circuit
intended was not mere guidance or instruction in how to conduct some of the steps
of the method patent.  Instead, the court indicates that the third party must perform
the steps of the patented process by virtue of a contractual obligation or other
relationship that gives rise to vicarious liability in order for a court to find
'direction or control.'"), *aff'd*, 318 Fed. Appx. 908, 909 (Fed. Cir. 2009).

[123]     *Muniauction*, 532 F.3d at 1330.

[124]     *Id.* at 1329.  *See* ITG 56.1 ¶¶ 49, 54; Pulse 56.1 ¶ 18.

committed by [the MacGregor Group] that are required to complete performance of [step (i)]."[125]  Put differently, assuming that the MacGregor XIP stored procedures "access" all records of open orders in an OMS database – an argument that, again, Liquidnet does not make – then I would have to find that it "perform[s] the steps of the patented process by virtue of a . . . relationship [with ITG] that gives rise to vicarious liability."[126]  In other words, I would have to find that ITG controls or directs the MacGregor XIP such that *it* performs the "accessing" step of claim (i) for MacGregor XIP integrations.  However, because I hold in Part IV.A.4. below that Channel is not an electronic marketplace as this Court has defined that term, I need not decide whether the stored procedures themselves "access all records of open orders."

## 4.     ITG Does Not Literally Infringe Steps (iii) and (v) of Claim One of the '834 Patent

Even if the MacGregor XIP's stored procedures "access[] . . . all records of open orders" in its database, ITG's products do not infringe as a matter of law because Channel is not an ETM as this Court has construed that term. Therefore, ITG cannot be found to perform steps (iii) or (v) of claim one, which require "sending" "non-binding indications to the at least one [*sic*] electronic

---

[125]     *Muniauction*, 532 F.3d at 1331.

[126]     *Global Patent Holdings*, 586 F. Supp. 2d at 1335.

marketplace."[127]

   Liquidnet argues that all of claim one is completed when order data is "swept into Channel from the OMS database."[128] But steps (iii) and (v) of claim one both require "sending" non-binding indications to at least one ETM, which this Court has defined as "an electronic destination that (1) receives and processes non-binding indications, (2) allows for the matching of non-binding indications with their contra interests and for the *negotiation and execution* of trades, and (3) has the capacity to record trades if and when they are executed."[129] Channel allows for neither the execution nor the negotiation of trades. Therefore, it cannot be considered an "ETM" to which non-binding indications are sent.

   As I explained during Claim Construction, "the term 'electronic marketplace' suggests an electronic destination where trades are executed."[130] But it is undisputed that neither Channel nor POSIT Alert – the two products Liquidnet

---

[127] Patent '834 col. 13 ll.5-6, 13-15.

[128] Liquidnet v. ITG Mem. at 23.

[129] *Claim Construction*, 2010 WL 199912, at *12 (emphasis added).

[130] *Id.* When quoting this Court's construction of the term "electronic marketplace" in its motion for summary judgment, Liquidnet has – literally – deleted the requirement that the electronic marketplace allow for the execution of trades. *See* Liquidnet v. ITG Mem. at 16.

accuses of infringing Patent '834 – allow for the execution of trades.[131]  Thus, those

venues – considered together or separately – cannot be "ETMs" to which non-

binding indications are sent.  Liquidnet's assertion that "the combination of

Channel ITG, POSIT Alert, and ITG execution venues satisfy the Court's definition

of 'electronic marketplace'"[132] fails in light of the fact that "the connections

between Channel, POSIT Alert, and ITG's trading destinations are not used unless

and until the trader chooses to use them."[133]

      ITG speculates that "Liquidnet is intent on arguing that all of the steps

of claim one are performed by the time unplaced share information arrives in

Channel because the revenues associated with the use of POSIT Alert are only

about one-third of the total revenues associated with the use of Channel."[134]  Thus,

ITG suggests that Liquidnet might have had a stronger infringement argument if

POSIT Alert were the "ETM" to which Liquidnet argued the non-binding

indications were sent.  Leaving aside for the moment that trades cannot be executed

---

[131]    *See* ITG 56.1 ¶ 39 ("No trades are matched and/or executed in
Channel."); *id.* ¶ 79 ("POSIT Alert is not a trading destination, but rather is an
alerting mechanism . . . .").

[132]    Liquidnet v. ITG Mem. at 22.

[133]    ITG Opp. Mem. to Liquidnet Mem. at 22.

[134]    *Id.* at 23.

in POSIT Alert, either,[135] even this argument would fail because POSIT Alert does

not "allow for" the negotiation of trades – a "necessary feature" of an ETM as this

Court has construed that term.[136]  Although "negotiation need not be an in-depth

process" and "can be as basic as each party assenting to the terms of the other

party's non-binding indications,"[137] POSIT Alert does not allow for even this

functionality because the steps taken by traders in response to a "match" in POSIT

Alert – a match that reveals neither trader's proposed price or quantity – do not

---

[135]     *See* ITG 56.1 ¶ 79.

[136]     *Claim Construction*, 2010 WL 199912, at *13 n.117.  During Claim
Construction, Liquidnet objected to the incorporation of a "negotiation
requirement" in the definition of "electronic marketplace" because the specification
"discloses a host of other modules and features that may optionally be incorporated
into the electronic marketplace, and the negotiations module is not described as
being any more fundamental to the operation of the electronic marketplace than
any of these features." *Id.* at *12 (quotation marks omitted).  However, I
distinguished the negotiation aspect of the patented method based on its description
in the specification's "Disclosure of the Invention Section." *See id.*  By contrast,
the other modules cited by Liquidnet were disclosed in the "Detailed Description
of the Preferred Embodiments" section – which expressly states that "the present
invention can lack one or more of the modules described herein," Patent '834 col.6
ll.62-63 – or were described merely as preferable aspects of the invention. *See
Claim Construction*, 2010 WL 199912, at *12.  I also noted that the specification
"does not just say that the claimed method includes a negotiation module.  It flatly
states that '[t]raders can communicate with the ETM to anonymously *negotiate*
trades of securities.'" *Id.* at *12 n.115.

[137]     *Id.* at *11.

-41-

constitute assent to the *terms* of the contra-indication.[138]

It bears noting that traders using POSIT Alert merely "expose" non-binding indications to traders at other institutions.  If POSIT Alert identifies a matching contra-indication – *i.e.*, an indication from a trader on the opposite side of the trade in the same security – each party is "alerted."  Each is then given the opportunity to enter a firm order – an opportunity she holds at all times, incidentally, regardless of whether her non-binding indication is matched in POSIT Alert.  There is no guarantee that Trader One will ultimately execute the trade with Trader Two.  In fact, Trader One's firm order may go un-executed; it may be filled by a firm order that was entered three hours earlier by a different trader; or it may be filled partially by Trader Two's (subsequently entered) firm order.

Even if Trader One's decision to enter a firm order, upon the realization that Trader Two *might* have a matching trade, could somehow constitute "assent" to *a* trade with Trader Two – despite the fact that the ultimate execution could easily occur *with an entirely different counterparty* – there is no conceivable

---

[138]     *See* ITG's Memorandum of Law in Support of Motion for Summary Judgment ("ITG Mem.") at 20 ("Because quantity (the number of shares) is an essential term of any stock trade, one cannot negotiate a stock trade – much less "assent[] to the terms of the other party's non-binding indications" – if one does not know what the quantity is."); *id.* ("The sending of a firm order cannot constitute negotiation of the proposed terms of another party's trade, because an essential term on which the party may agree to trade – <u>i.e.</u>, the quantity – is never known, let alone discussed.").

way that such a decision constitutes Trader One's assent to the *terms* of Trader

Two's contra-indication.  This is because the only information conveyed to a trader

"alerted" to a match in POSIT Alert is that one or more traders want to buy the

security she wants to sell, or sell the security she wants to buy.  Neither trader

knows how much of her non-binding indication will be executed even if she

converts it to a firm order simultaneous with the trader/s on the other side.  And

ITG's products do not afford traders the ability even to *expose* a non-binding price

indication to a counterparty through POSIT Alert,[139] let alone *negotiate* that price

term.

        The fact that "the trader has the ability to change the quantity before

converting it to a firm order and sending it out for matching"[140] or "put a specific

price range on it before requesting execution"[141] does not transform the process into

a negotiation; in fact, traders' ability to change their orders' price and quantity

terms *after* they are alerted to a match only underscores that neither trader could

possibly be assenting to the other's "terms."  Nor does it matter that traders know

their trades will execute above a "minimum order size set for the system."[142]

---

[139]    *See* ITG 56.1 ¶ 86.

[140]    Liquidnet Opp. to ITG Mem. at 5.

[141]    Liquidnet v. ITG 56.1 ¶ 66 (quotation marks omitted).

[142]    Liquidnet Opp. to ITG Mem. at 18 (quotation marks omitted).

Furthermore, traders using POSIT Alert are notified when their non-binding indication is matched by *either* (1) a non-binding indication or (2) a firm order already entered in POSIT Now.  Surely a trader's decision to convert a non-binding indication to a firm order in the latter situation cannot constitute negotiation.  *First*, given my description of the minimum requirement for negotiation – "*each* party assenting to the terms of the other party's *non-binding indications*"[143] – there can be no negotiation if only one of the party's "indications" is non-binding.  *Second*, it would make no sense to say that two traders were "negotiating" simply because Trader One decided to enter a firm order that ultimately influenced Trader Two's decision to trade, totally unbeknownst to Trader One.

In conclusion, Channel/POSIT Alert may transmit "non-binding indications" among traders, but they do not "'provide information to allow traders to enter into *negotiations* to ultimately trade the securities.'"[144]  A trader does not "negotiate" a trade when he decides to execute an order based on knowledge that a contra-indication exists somewhere in the market.  The prosecution history may

---

[143]     *Claim Construction*, 2010 WL 199912, at *11 (emphasis added).

[144]     *Id.* at *10 (quoting an exchange between the patent applicant and a PTO examiner during the prosecution of the patent).  *See* Pulse Mem. at 5 ("Since [negotiation] functionality was a business advantage that Liquidnet touted from the start, it is no surprise that Liquidnet included this aspect of its product in the '834 patent.").

-44-

suggest that Patent '834 "do[es] not require any particular form of negotiation," but none of the methods by which ITG's products facilitate trading constitutes a form of negotiation. Therefore, because Channel/POSIT Alert do not constitute an ETM as this Court has construed that term, ITG cannot literally infringe steps (iii) and (v) of claim one.

### 5.    Conclusion

For the aforementioned reasons, both ITG and Pulse are entitled to summary judgment of non-infringement with respect to claim one of the '834 Patent.

### B.    ITG Is Entitled to Summary Judgment of No Willful Infringement

Liquidnet is suing ITG not only for literal infringement, but also for willful infringement – a cause of action that carries the possibility of enhanced damages. ITG now moves for summary judgment that, as a matter of law, it did not willfully infringe the '834 Patent. Liquidnet argues that "at a minimum, there exist genuine issues of material fact for trial that preclude summary judgment on the issue of ITG's willful infringement."[145] In particular, Liquidnet asserts that "ITG copied the Liquidnet System embodiment of the '834 Patent invention" and that, after the '834 Patent was

brought to its attention by Liquidnet, ITG failed to articulate even

---

[145]    Liquidnet Opp. Mem. to ITG Mem. at 1.

one non-infringement defense, relying instead on a bogus inequitable conduct defense based on a patent application for the failed 'Harborside' system, while choosing to expand, rather than abate, its infringing activity. ITG also continued its willful conduct throughout this litigation by asserting baseless claims and defenses that contravene this Court's claim construction rulings, ITG's own production documents, and the deposition admission of ITG's own expert witnesses.[146]

Meanwhile, ITG moves for summary judgment on the grounds that, because all of the conduct on which Liquidnet bases its willful infringement claim occurred (1) after ITG learned of Patent '834 and (2) after Liquidnet filed suit against it for willful infringement ("post-filing"), Liquidnet's failure to move for a preliminary injunction precludes it from accruing enhanced damages based solely on ITG's post-filing conduct.

### 1.    Factual Background Relating to Willful Infringement Claim

Liquidnet's patent issued on November 14, 2006.[147]  Six days later, on November 20, 2006, ITG learned of the patent.[148]  The next day, Liquidnet filed a complaint in Delaware charging ITG with willful infringement.[149]  Because Liquidnet sued under the wrong name, however, subject matter jurisdiction in

---

[146]    *Id.*

[147]    *See* Liquidnet 56.1¶ 1.

[148]    *See* ITG 56.1 ¶ 94.

[149]    *See id.*  Liquidnet maintained its willful infringement claim against ITG in its first amended complaint, filed on January 8, 2007. *Id.* ¶ 99.

Delaware was improper.[150]  ITG alerted Liquidnet to this jurisdictional defect on

January 24, 2007 – two months after Liquidnet sued ITG in Delaware -- by sending

Liquidnet a letter informing it of a declaratory judgment action it had filed in this

Court one day earlier naming the proper patentee.[151]  Three days after ITG filed that

suit, Liquidnet voluntarily dismissed the Delaware action in favor of this action.[152]

On February 13, 2007, Liquidnet filed an Answer to ITG's Complaint and

Counterclaims which reasserted Liquidnet's infringement and willful infringement

allegations.[153]  Liquidnet has not sought a preliminary injunction against ITG in the

almost four years this litigation has been pending, either in this Court or in the

Delaware action.[154]

> ### 2.    Applicable Law
>
> "To willfully infringe a patent, the patent must exist and [the accused

---

[150]    *See id.* ¶¶ 101-102. The Delaware complaint named Liquidnet, Inc., instead of Liquidnet Holdings, Inc. – the owner of the '834 patent. *See id.*

[151]    *See id.*  ITG also indicated in the letter its intention to file a motion to dismiss the Delaware action. *See id.* ¶ 102.

[152]    *See id.* ¶ 103.

[153]    *See id.* ¶ 104.

[154]    *See id.* ¶ 105. On January 24, 2009, ITG raised Liquidnet's failure to seek a preliminary injunction as a basis for dismissing its willful infringement claim in a letter to Judge Lynch. *See id.*  To date, Liquidnet has still not sought preliminary injunctive relief.

infringer] must have knowledge of it."[155]  Then, "a patentee must show by clear and convincing evidence [1] that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent" and "[2] that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer."[156]  However,

> a willfulness claim asserted in the original complaint must necessarily be grounded exclusively in the accused infringer's *pre-filing* conduct.  By contrast, when an accused infringer's *post-filing* conduct is reckless, a patentee can move for a preliminary injunction, which generally provides an adequate remedy for combating post-filing willful infringement.  A patentee who does not attempt to stop an accused infringer's activities in this manner should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct.[157]

### 3.    ITG Is Entitled to Summary Judgment of No Willful Infringement

ITG argues that it is entitled to summary judgment on Liquidnet's claim that it willfully infringed Patent '834 because (1) ITG had only a single day of pre-litigation ("pre-filing") knowledge of Patent '834 and (2) Liquidnet has never sought a preliminary injunction against ITG, thereby precluding its recovery

---

[155]    *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985).

[156]    *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).

[157]    *Id.* at 1374 (citations omitted) (emphasis added).

for "post-filing" willful infringement under *Seagate*.[158]  It is undisputed that

Liquidnet's patent issued on November 14, 2006;[159] six days later, on November 20,

2006, ITG learned of the patent;[160] and the next day, Liquidnet filed a complaint

against ITG for willful infringement in Delaware.[161]  Aside from November 20,

2006 – the day ITG learned of the patent but one day before Liquidnet's complaint

was filed – there is no pre-filing conduct upon which Liquidnet may base a willful

infringement claim.  Thus, Liquidnet's entire claim is based on post-filing conduct

that has allegedly occurred over the span of four years since Liquidnet filed suit

against ITG in Delaware.  Liquidnet could have moved for a preliminary injunction

at any time during the past four years.  Because it did not, it "should not be allowed

to accrue enhanced damages"[162] for willful infringement.

      Liquidnet acknowledges that "the issue of whether the patentee has

moved, or should have moved, for a preliminary injunction only arises under

*Seagate* where the patentee is relying solely upon post-complaint conduct of the

---

[158]    *See* ITG Mem. at 23.

[159]    *See* Liquidnet 56.1 ¶ 1.

[160]    *See* ITG 56.1 ¶ 94.

[161]    *See id.*

[162]    *Seagate*, 497 F.3d at 1374.

accused infringer to prove willfulness."[163]   However, it argues that the "operative

complaint for purposes of determining ITG's willful infringement of Patent '834 is

ITG's declaratory judgment complaint filed in this Court [on January 23, 2007], not

Liquidnet's dismissed Delaware complaint."[164]   Therefore, it argues, because

"Liquidnet is relying upon both pre-complaint and post-complaint conduct of ITG

to establish willfulness . . . , it is irrelevant . . . whether Liquidnet ever moved for a

preliminary injunction in this action, or in the Delaware action."[165]

I reject this argument. Liquidnet offers no logical reason why ITG's

complaint, as opposed to its dismissed Delaware complaint, should trigger the start

of the post-filing period.  Liquidnet filed suit against ITG in Delaware one day after

ITG learned of its patent.  It alleged willful infringement in both its initial and its

first amended complaint.[166]   Because it named the wrong plaintiff in the Delaware

complaint, however, subject matter jurisdiction was improper.[167]   Thus, three days

---

[163]     Liquidnet Opp. Mem. to ITG Mem. at 23.  Thus, Liquidnet essentially concedes that – had subject matter jurisdiction in Delaware been proper, and had the case proceeded there – the issue of whether it moved or should have moved for a preliminary injunction would be relevant to my resolution of this motion.

[164]     *Id.*

[165]     *Id.* at 23-24.

[166]     *See* ITG 56.1 ¶ 99.

[167]     *See id.* ¶¶ 101-102.

-50-

after ITG filed suit in this Court seeking declaratory relief for non-infringement,[168]

Liquidnet voluntarily dismissed the Delaware action in favor of this action.[169]

Knowledgeable of the Patent and of Liquidnet's grounds for alleging infringement,

ITG was "force[d] to choose between [1] resting on theories of invalidity and non-

infringement it believe[d] to be objectively reasonable and [2] engaging in costly

and potentially unnecessary redesign of its accused products."[170]  Had Liquidnet

sought a preliminary injunction, those theories would have been tested at the time

ITG was relying on them.[171]  The policy rationale underlying *Seagate* compels a

finding that Liquidnet should not be permitted, by virtue of the length of this

litigation, to obtain enhanced damages for four years' time when it could have

sought a preliminary injunction as early as November 22, 2007.[172]

---

[168]    *See id.* ¶ 100.

[169]    *See id.* ¶ 103.

[170]    *Webmap Tech., LLC v. Google, Inc.*, No. 2:09-CV-343-DF-CE, 2010
WL 3768097, at *6 (E.D. Tex. Sept. 10, 2010), *adopted in its entirety by Webmap
Tech., LLC v. Google, Inc.*, No. 2:09-CV-343-DF-CE, 2010 WL 3835118, at *1
(E.D. Tex. Sept. 28, 2010) (dismissing claim for post-filing willful infringement
"until Plaintiff seeks and the court rules upon a preliminary injunction in accord
with *Seagate* . . . .").

[171]    *See Seagate*, 497 F.3d at 1374 ("A substantial question about
invalidity or infringement is likely sufficient not only to avoid a preliminary
injunction, but also a charge of willfulness based on post-filing conduct.").

[172]    Liquidnet might have a stronger argument if, upon discovering that
Liquidnet had named the wrong plaintiff in its Delaware complaint, ITG had

Liquidnet also argues that the *Seagate* "rule precluding a patentee from pursuing a claim of willful infringement where the patentee did not first move for a preliminary injunction" is not absolute.[173] This is true.[174] However, there are

---

remained silent. But ITG should not be punished for essentially correcting Liquidnet's filing error and seeking declaratory relief that the defenses it *asserted* in the Delaware action – and that would have been tested had subject matter jurisdiction been appropriate – were valid.

  Even if the two-month period during which Liquidnet's complaint was improperly filed in Delaware could somehow be considered "pre-filing," Liquidnet would still be precluded from seeking enhanced damages after January 23, 2007, when ITG filed suit in this Court. *See Baxter Healthcare Corp. v. Fresenius Med. Care Holdings, Inc.*, No. C 07-1359, 2010 WL 668039, at *18-*19 (N.D. Cal. Feb. 19, 2010) (limiting patentee's enhanced damages claim to "a maximum of treble compensatory damages (if any) from the accused infringer's *pre-suit* conduct" because patentee "did not seek injunctive relief to stop the alleged infringement" and therefore "should not be entitled to seek enhanced damages for any post-filing infringement."); *GSI Group, Inc. v. Sukup Mfg. Co.*, 591 F. Supp. 2d 977, 984-85 (C.D. Ill. 2008) ("the potential enhanced damages are limited to three times the compensatory damages for [the accused infringer's] alleged *pre-filing infringement* of the [] Patent" because the patentee had "an adequate remedy for post-filing willful infringement through the pursuit of preliminary injunctive relief" and "could have stopped such infringement" that way.) (emphasis added).

[173] Liquidnet Opp. Mem. to ITG Mem. at 23.

[174] *See Seagate*, 497 F.3d at 1374 ("*in ordinary circumstances*, willfulness will depend on an infringer's prelitigation conduct") (emphasis added); *see also Webmap Tech.*, 2010 WL 3768097, at *4 ("certain extenuating circumstances may exist to allow a plaintiff to sustain a claim of post-filing willful infringement despite the plaintiff's failure to first seek a preliminary injunction"); *see also Netscape Commc'ns Corp. v. ValueClick, Inc.*, 684 F. Supp. 2d 699, 728 (E.D. Va. 2010) ("While not dispositive, plaintiff's decision not to seek a preliminary injunction has been deemed relevant."); *Krippelz v. Ford Motor Co.*, 670 F. Supp. 2d 806, 812 (N.D. Ill. 2009) ("[T]he proposition that failure to seek a preliminary injunction constitutes a forfeit of a claim for willful infringement is

limited circumstances under which a patentee may sustain a claim of post-filing

willful infringement despite the patentee's failure to first seek a preliminary

injunction.[175]  Such post-filing circumstances might include, *e.g.*, (1) a patent's

surviving reexamination proceedings without narrowed claims[176] or (2) a patentee's

neither practicing its invention nor directly competing with the accused infringer

(rendering its failure to seek a preliminary injunction reasonable).[177]  However,

Liquidnet makes no argument that such extenuating circumstances are present in

this case; it merely urges this Court to ignore the Federal Circuit's clear mandate.

    Finally, Liquidnet argues that the *Seagate* rule announced on August

20, 2007 is procedural in nature, and therefore cannot be applied retroactively "to

---

neither an absolute nor a general rule applicable to all patent cases."); *Affinity Labs of Tex., LLC v. Alpine Elecs. of Am., Inc.*, No. 9:08-CV-171, slip op. at 2 (E.D. Tex. Sept. 2, 2009) ("there is no *per se* rule that a patentee who relies solely on post-filing conduct for his willfulness claim is foreclosed from receiving enhanced damages if he does not also seek preliminary injunctive relief").

    [175]    *See Webmap Tech.*, 2010 WL 3768097, at *4; *Affinity Labs*, No. 9:08-CV-171 at 2.

    [176]    *See St. Clair Intellectual Prop. Consultants, Inc. v. Palm, Inc.*, No. 06-404-JJF-LPS, 2009 WL 1649751, at *1 (D. Del. June 10, 2009).

    [177]    *See Krippelz*, 670 F. Supp. 2d at 812.  Similarly, the *Seagate* court "recognize[d] that in some cases a patentee may be denied a preliminary injunction despite establishing a likelihood of success on the merits, such as when the remaining factors are considered and balanced.  In that event, whether a willfulness claim based on conduct occurring solely after litigation began is sustainable will depend on the facts of each case." 497 F.3d at 1374 (citations omitted).

-53-

Liquidnet's [November 21, 2006] Delaware action."[178]  I note at the outset that the

Federal Circuit has held that *Seagate*'s new "objective recklessness" standard

applies retroactively.[179]  However, it has not specifically addressed the retroactivity

of the preliminary injunction "requirement."

      *First*, it is not so clear that *Seagate*'s preliminary injunction

requirement is procedural.  If "failure to seek a preliminary injunction is not

dispositive"[180] – as suggested by the cases on which Liquidnet relies – then it is

better-viewed as a factor to be weighed in a totality-of-the-circumstances approach

to determining whether there is an objectively high likelihood of infringement of a

valid patent – a rule more substantive than procedural in nature.  In other words,

failure to obtain a preliminary injunction serves as evidence that the accused

---

[178]    Liquidnet Opp. Mem. to ITG Mem. at 23 (citing *Schriro v. Summerlin*, 542 U.S. 348, 448 (2004), for the proposition that "new rules of procedure generally do not apply retroactively").  When arguing that the *Seagate* rule is procedural, Liquidnet points to its Delaware filing as the operative complaint (presumably to exaggerate the length of time between that filing on November 21, 2006, and issuance of the *Seagate* opinion on August 20, 2007); of course, if the Delaware filing is the operative complaint, then there is no pre-filing period of time that can serve as the basis for Liquidnet's argument that it "is relying upon both pre-complaint and post-complaint conduct." *Id.* at 23-24. Retroactivity aside, *Seagate* has been in effect during the majority of the time this case has been pending and, one could argue, should be applied for that reason alone.

[179]    *See Voda v. Cordis Corp.*, 536 F.3d 1311, 1328 n.10 (Fed. Cir. 2008).

[180]    *Netscape Commc'ns*, 684 F. Supp. 2d at 728.

infringer's defenses are "substantial, reasonable, and far from the sort of easily-dismissed claims that an objectively reckless infringer would be forced to rely upon."[181]

   *Second*, at least three federal district courts have applied *Seagate*'s preliminary injunction "requirement" retroactively – albeit without discussion of whether the rule is substantive or procedural in nature – under circumstances virtually identical to those presented here.[182]  For example, a federal court in the Eastern District of Texas relied on *Seagate* to grant accused infringers' motion for summary judgment on a patentee's pre-*Seagate* willful infringement claim.[183]

---

   [181] *ResQNet.com, Inc. v. Lansa, Inc.*, 553 F. Supp. 2d 397, 420 (S.D.N.Y. 2008).

   [182] *See Anascape, Ltd. v. Microsoft Corp.*, No. 9:06-CV-158, 2008 WL 7182476, at *4 (E.D. Tex. Apr. 25, 2008); *GSI Group*, 591 F. Supp. 2d at 984-85 ("The statements in the *Seagate* opinion . . . are quite clear.  The Federal Circuit stated that a patent holder . . . has an adequate remedy for post-filing willful infringement through the pursuit of preliminary injunctive relief. . . .  This Court must follow the Federal Circuit.") (finding patentee was "not entitled to enhanced damages for any post-filing willful infringement" because it "could have stopped such infringement through preliminary injunctive relief" where the complaint was filed *in 2005*); *Baxter Healthcare*, 2010 WL 668039, at *18-*19 ("persuaded by the reasoning in *Seagate*" that "the remedy that was available to [plaintiffs] for any alleged willful, post-litigation conduct collapsed when [plaintiffs] failed to move for a preliminary injunction at the inception of the case in *March 2007* ") (emphasis added); *see also Webmap Tech.*, 2010 WL 3768097, at *4 ("Even assuming *Seagate* may be dicta on this point, . . . it accurately reflects the general rule in the Federal Circuit.  No extenuating circumstances have been alleged in this case that would justify a departure from that rule.").

   [183] *See Anascape*, 2008 WL 7182476, at *3.

Applying *Seagate*'s guidance that "'in ordinary circumstances, willfulness will depend on an infringer's prelitigation conduct,'"[184] the court denied the patentee's claim for willful infringement because

> [the patentee] did not even attempt to stop any alleged infringing activity, electing instead to allow any enhanced damages to accrue. The court does not impose a categorical rule that lack of a motion for preliminary injunction automatically bars post-suit willful infringement, but rather finds that in these particular circumstances, [the patentee's] post-suit conduct coupled with the lack of any evidence of pre-suit notice of the [] patent establishes that there is no willful infringement by [the accused infringers].[185]

One court in this district has reasoned (in dicta) that "it is unlikely that *Seagate*'s discussion of the necessity of a preliminary injunction applies retroactively,"[186] reasoning that "[i]t is one thing to apply *Seagate*'s objective recklessness standard retroactively and quite another to bar [a patentee's] willful infringement claim as a matter of law because [a patentee] did not seek a preliminary injunction that it had no reason to believe was required."[187] However, that reasoning did not form the basis for the court's decision; instead, it found that

---

[184] *Id.* (citing *Seagate*, 497 F.3d at 1374).

[185] *Id.*

[186] *Astrazeneca AB v. Apotex Corp.*, Nos. 01 Civ. 9351, M-21-81, 2010 WL 2541180, at *3 (S.D.N.Y. June 9, 2010).  This appears to be the only case that has addressed this issue explicitly.

[187] *Id.*

because the patentee's claims for willful infringement were not based *solely* on the infringer's post-filing conduct, "*Seagate*' s requirement of a preliminary injunction does not apply."[188]

Thus, for the aforementioned reasons, ITG's motion for summary judgment on Liquidnet's claim that it willfully infringed Patent '834 is granted.

C.    **Liquidnet's Motion for Partial Summary Judgment on ITG's Inequitable Conduct Claim Is Denied**

In its amended complaint, ITG alleges that Liquidnet's CEO, Seth Merrin, and the other named inventors of Patent '834 did not invent what is claimed in Patent '834 but rather copied a system called "@Harborside" developed by Richard Holway at a firm called Jefferies & Co. from 1997-1999.[189]    ITG contends that Liquidnet's failure to disclose the @Harborside system to the PTO during prosecution constitutes inequitable conduct, rendering Patent '834 unenforceable.[190] In particular, it has alleged three bases for a finding of inequitable conduct: (1) Liquidnet's failure to disclose a patent application filed by Harborside, (2) Liquidnet's failure to disclose the "@Harborside" system itself, and (3) a statement Liquidnet made during prosecution that it "know[s] of no prior art system or

---

[188]    *Id.*

[189]    *See* 2/15/08 ITG Amended Complaint Against Liquidnet ("ITG Amended Complaint") ¶¶ 18-86; ITG Opp. Mem. at 24 n.16.

[190]    *See id.*

-57-

method, manual or automated, for reading OMS records reflecting orders, deriving non-binding indications and providing such non-binding indications to a separate marketplace."[191]  Liquidnet now moves for summary judgment that the *first* ground on which ITG alleges inequitable conduct – failure to disclose the patent application – fails as a matter of law because "ITG does not have any evidence that anyone at Liquidnet knew of the contents of the Harborside patent application."[192]

### 1.    Factual Background Relating to ITG's Inequitable Conduct Claim

ITG has produced evidence that, prior to the formation of Liquidnet, Holway and Jefferies & Co. hired VIE Systems to write, under Holway's direction, the software code to integrate a system called @Harborside with OMSs used by Jefferies' clients.[193]  Acccording to ITG, Merrin (Liquidnet's CEO and a named inventor on Patent '834) owned VIE, and two VIE employees – Kevin Lupowitz (another named inventor on Patent '834) and Eric LeGoff (a founder of Liquidnet) – worked on the @Harborside integration.[194]  Merrin, Lupowitz, and LeGoff left VIE

---

[191]    ITG Response to Liquidnet 56.1 ¶ 83.

[192]    Liquidnet Reply Mem. to ITG Opp. Mem. at 9.

[193]    *See* ITG Response to Liquidnet 56.1 ¶ 80.

[194]    *See id.*

and started Liquidnet, a direct competitor to @Harborside.[195]

ITG presents evidence (1) that Holway told both Lupowitz and Merrin in 2001 that he believed Liquidnet had stolen his invention, and (2) that John Halloran (a third named inventor on Patent '834) knew about this accusation.[196] ITG also presents evidence suggesting that these persons, and others at Liquidnet, did not disclose @Harborside to the PTO during the prosecution of Patent '834, instead disclosing to the PTO only a later version of @Harborside called "Harborside+" and telling the PTO that the later version was a copy of *Liquidnet*'s invention.[197]

Regarding the third basis for its inequitable conduct defense, ITG presents evidence that Liquidnet did not disclose to the PTO a patent application that Holway and his colleagues at Jefferies had filed for the @Harborside system – an application that was publicly available as of January 2, 2003.[198]  As evidence that Liquidnet knew about this patent application, ITG points to (1) testimony by Holway that he told Merrin, Lupowitz, and LeGoff about his patent application;[199]

---

[195]    *See id.*

[196]    *See id.* ¶ 81.

[197]    *See id.*

[198]    *See id.*

[199]    *See id.* ¶¶ 80-82.

(2) an email dated April 7, 2005, showing that LeGoff and Merrin had been told about the Harborside patent application;[200] and (3) testimony by Merrin and LeGoff that they were aware during the prosecution of the Liquidnet patent application that there was a Harborside patent application.[201]  As evidence that Liquidnet did *not* know about this patent application, Liquidnet points to Holway's deposition testimony that he never gave a copy of the Harborside patent application to anyone at Liquidnet and could not identify anyone who provided the application to anyone at Liquidnet.[202]

### 2.    Applicable Law

"To hold a patent unenforceable due to inequitable conduct, there must be clear and convincing evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the U.S. Patent and Trademark Office ('PTO')."[203]   "Clear and convincing evidence must prove that an applicant had the specific intent to . . . mislead[ ] or deceiv[e] the PTO.  In a

---

[200]    *See id.* ¶¶ 80-81.

[201]    *See id.*

[202]    *See* Liquidnet v. ITG Mem. at 25.

[203]    *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1363 (Fed. Cir. 2007).

-60-

case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference."[204] Even "'gross negligence' does not . . . justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive."[205]

### 3. Whether Liquidnet Made a "Deliberate Decision to Withhold a *Known* Material Reference" Raises a Genuine Issue of Material Fact

Drawing all reasonable inferences in ITG's favor, I conclude that there is a genuine issue of material fact whether, in failing to disclose the Harborside patent application, Liquidnet "made a deliberate decision to withhold a known material reference"[206] – specifically, the Harborside patent application.

Liquidnet argues that, because there is no evidence that Liquidnet received a copy of the Harborside patent application, there is insufficient evidence

---

[204]    *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008) (quotation marks omitted).

[205]    *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988).

[206]    *Star Scientific*, 537 F.3d at 1366 (quotation marks omitted).

for a trier of fact to find that Liquidnet knew of its contents.[207]  I disagree.  Based on

the undisputed fact that Merrin, Lupowitz, and LeGoff knew the Harborside patent

application existed – on an invention they were accused of stealing – a reasonable

trier of fact could infer that Liquidnet knew of its contents, even if there is no hard

evidence that it received or had in its possession a physical copy of the application.

Liquidnet is patently wrong that there is "no evidence showing, what, if anything,

Liquidnet personnel knew about the Harborside patent application."[208]  However, it

is for a trier of fact to determine whether the named inventors and others involved

in the prosecution of Patent '834 had knowledge of the Harborside Patent

application (and its contents) and deliberately withheld it from the PTO.[209]

Therefore, Liquidnet's motion for summary judgment is denied.

## V.   CONCLUSION

        For the aforementioned reasons, ITG's and Pulse's motions for

---

[207]     *See* Liquidnet v. ITG Mem. at 24-25.  I note that Liquidnet does not
argue the application was not a "material reference," only that there is insufficient
evidence that Liquidnet knew of its contents.  *See id.* at 23-25.

[208]     *Id.* at 24.

[209]     *See McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) ("[i]t is a
settled rule that [c]redibility assessments, choices between conflicting versions of
the events, and the weighing of evidence are matters for the jury, not for the court
on a motion for summary judgment.") (quotation marks and citation omitted); *see
also Orange Lake Assocs., Inc. v. Kirkpatrick*, 825 F. Supp. 1169, 1173 (S.D.N.Y.
1993) ("[W]here a [party's] intent and state of mind are implicated, summary
judgment is ordinarily inappropriate.").

summary judgment of no literal infringement are granted and Liquidnet's motions are denied; ITG's motion for summary judgment on Liquidnet's willful infringement claim is granted; and Liquidnet's motion for summary judgment on ITG's inequitable conduct claim is denied.  The Clerk of the Court is directed to close these motions (Docket nos. 74 and 82 (sealed) in 07 Civ. 510; Docket nos. 61 (sealed) and 62 (sealed) in 07 Civ. 6886).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 20, 2010

-63-

## - Appearances -

**For Investment Technology Group, Inc., ITG, Inc., ITG Solutions Network, Inc., and the MacGregor Group, Inc.:**

Steven M. Lieberman, Esq.
Daniel Leavitt Shores, Esq.
Brian A. Tollefson, Esq.
R. Elizabeth Brenner-Leifer, Esq.
Joseph A. Hynds, Esq.
Martin M. Zoltick, Esq.
Rothwell, Figg, Ernst & Manbeck, P.C.
1425 K Street, N.W.
Suite 800
Washington, D.C. 20005
(202) 783-6040

Eric Jonathan Seiler, Esq.
Friedman, Kaplan, Seiler and Adelman
1633 Broadway
New York, New York 10019
(212) 833-1103

**For Pulse Trading, Inc.:**

Robert R. Gilman, Esq.
Thomas J. Clark, Esq.
Paul J. Hayes, Esq.
Mintz Levin Cohn Ferris Glovsky & Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111
(617) 348-3046

Kevin N. Ainsworth, Esq.
Mintz Levin Cohn Ferris Glovsky & Popeo, P.C.
Chrysler Center
666 Third Avenue
New York, New York 10017
(212) 692-6745

**For Liquidnet Holdings, Inc.:**

Michael A. Nicodema, Esq.
Gaston Kroub, Esq.
Greenberg Traurig, LLP
200 Park Avenue
New York, New York 10166
(212) 801-2185

Mary Olga Lovett, Esq.
Greenberg Traurig, LLP
1000 Louisiana Street
Suite 1100
Houston, Texas 77002
(713) 374-3541